# CORRECTED COPY

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court Sitting *En Banc*

**UNITED STATES, Appellee**
**v.**
**Sergeant First Class ALAN D. ESLINGER**
**United States Army, Appellant**

ARMY 20070335

Headquarters, Fort Carson
Michael J. Hargis, Military Judge
Colonel Kent R. Meyer, Staff Judge Advocate

For Appellant: Major William M. Fischbach III, JA; Charles W. Gittins, Esquire* (on brief); Charles W. Gittins, Esquire* (on reply brief).

For Appellee: Lieutenant Colonel Francis C. Kiley, JA; Captain Trevor B.A. Nelson, JA (on brief).

21 May 2010

----------------------------------
OPINION OF THE COURT
----------------------------------

CONN, Senior Judge:

A panel of officer and enlisted members, sitting as a general court-martial, convicted appellant, contrary to his pleas, of three specifications of wrongful possession of child pornography during three distinct periods of time, in violation of Article 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 934. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to Private E1. This case is before the court for review pursuant to Article 66, UCMJ.

Appellant asserts two errors. First, appellant avers the military judge erred by failing to sua sponte give an accident or mistake of fact instruction relating to appellant's possession of child pornography. For reasons outlined below, we find appellant affirmatively waived such an instruction.

*Corrected

Second, appellant avers the military judge committed plain error by permitting government rebuttal witnesses, in sentencing, to testify without adequate foundation and to opine appellant should be removed from the Army.  Under the particular facts of appellant's case, we find the testimony of several rebuttal witnesses was erroneously admitted, but we do not find plain error.  We reemphasize the requirements and limitations of Rule for Courts-Martial [hereinafter R.C.M.] 1001(b) apply to government rebuttal witnesses testifying about an accused's rehabilitative potential in sentencing.  Further, when such witnesses are commanders and senior noncommissioned officers (NCO), we stress that military judges must ensure the foundation for such testimony is rationally based on personal knowledge of the accused.  Additionally, without limiting the government's ability to rebut sentencing evidence under R.C.M. 1001(d), we conclude the foundational requirements for government witnesses offered to rebut defense "retention" evidence must generally conform with the principles of R.C.M. 1001(b)(5)(B)-(F).  Last, we strongly recommend military judges provide an appropriate limiting instruction when such "retention" evidence is presented before members.

## AFFIRMATIVE DEFENSE INSTRUCTIONS

### *Instruction on Affirmative Defense of Accident or Mistake*

Appellant had been living with a woman, LM, for approximately two years.  In March 2006, she discovered images of child pornography on appellant's laptop computer and reported it to police.  Forensic evaluation of appellant's laptop and external storage devices uncovered more than 1,700 deleted images and videos of child pornography.  The files were downloaded to appellant's laptop computer and saved on the storage devices over several years.  Forensic evaluation also showed appellant's laptop contained evidence of thousands of files or file names containing terms commonly associated with child pornography.  The timeframe included periods when appellant was at Fort Bragg and Fort Carson, as well as while appellant was deployed to Iraq.

Appellant testified and admitted he possessed the laptop and storage devices, but denied knowingly downloading or possessing child pornography.  Appellant suggested someone else, using his computer, could have downloaded the images.  Appellant demonstrated LM had access to and used his computers while living with him.  Shortly before her discovery of the child pornography, LM had herself subscribed to and downloaded files from "Easy News," a file sharing domain appellant admitted subscribing to for many years and from which he downloaded adult pornography.  He also testified that while in Iraq, members of his Special Forces (SF) team and others had access to and used his computer.

Appellant testified he was in training and did not have his laptop with him during a few weeks when relevant images were allegedly downloaded at Fort Bragg.

2

A friend testified he visited appellant during this timeframe and did not see appellant's laptop during the visit. The government presented evidence contesting appellant's assertion.

At the close of evidence, the military judge discussed proposed instructions with counsel and specifically asked civilian defense counsel whether he was requesting instructions on any affirmative defenses, including accident or mistake. The ensuing colloquy took place:

> MJ: All right. Defense, do you see any affirmative defense[s] that apply in this case?
>
> CDC: No, sir.
>
> MJ: Are you waiving any affirmative defenses?
>
> CDC: Well, again, I don't see any—
>
> MJ: Same discussion we had last time, Mr. Spinner [regarding lesser-included offenses].
>
> CDC: Right. So, I guess I waive them—
>
> MJ: Okay. Very—
>
> CDC: —the ones I don't know about.

Given the arguably ambivalent waiver, after instructions and before sending the members back for deliberations, the military judge again asked defense counsel whether he was affirmatively waiving a specific instruction on accident or mistake of fact. The following additional colloquy took place:

> MJ: . . . Mr. Spinner, prior to findings instructions, we had a discussion about waiver of affirmative defenses. We had a discussion about the defense of mistake or accident.
>
> CDC: Yes, Your Honor.
>
> MJ: And you were taking the position consistent with mine that it did not apply.
>
> CDC: That is correct, Your Honor.
>
> MJ: Are you affirmatively waiving that instruction?
>
> CDC: Yes, sir.

In instructing the members on the elements of each of the three specifications of possession of child pornography, the military judge emphasized possession must be knowing. The military judge defined the "knowing" element to require appellant's possession of child pornography not be mistaken or accidental.

### *Affirmative Defense Instruction Law*

A military judge has a sua sponte duty to give certain instructions when reasonably raised by the evidence, even in the absence of a request by the parties. *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (citing R.C.M. 920(e)). Mistake of fact is a special defense that a military judge must instruct court members on sua sponte if reasonably raised by evidence. R.C.M. 916(j); R.C.M. 920(e)(3). Waiver does not apply based on the mere failure to request the affirmative defense instruction or to object to its omission. *United States v. Taylor*, 26 M.J. 127, 128-29 (C.M.A. 1988). However, the defense can make a knowing waiver of a reasonably raised affirmative defense. *United States v. Gutierrez,*** 64 M.J. 374, 376 (C.A.A.F. 2007) (citing *United States v. Barnes*, 39 M.J. 230, 233 (C.M.A. 1994)). For a waiver to be effective, it must be clearly established that appellant intentionally relinquished a known right. *See United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008) (citations and quotations omitted).

As our superior court noted in *Gutierrez,*** the issue of waiver of affirmative defenses is substantially similar to waiver of lesser-included offenses. 64 M.J. at 377. Both are required instructions pursuant to the *Manual for Courts-Martial* (*see* R.C.M. 920(e)(2) & (3)) and cannot be waived simply by counsel's failure to request such instructions. *Gutierrez,*** 64 M.J. at 377. However, in the context of lesser-included offenses, deferential or noncommittal statements regarding an instruction may constitute waiver. *United States v. Mundy*, 9 C.M.R. 130, 133-34 (C.M.A. 1953) (statements "The defense will leave it up to the law officer" and "consent to the ruling of the law officer" amount to waiver of instruction on lesser-included offenses). *See also United States v. Smith*, 50 M.J. 451, 456 (C.A.A.F. 1999) (defense statement that an instruction is "not exactly what I wanted, but it's close," amounts to a waiver of instruction on lesser-included offenses; no specific language is required, provided it reflects a purposeful waiver); *United States v. Strachan*, 35 M.J. 362, 364 (C.M.A. 1992) (defense counsel waived instruction on lesser-included offense when, after requesting the instruction and being asked by the military judge how the instruction applied, he replied, "The defense will withdraw that.").

**Corrected

ESLINGER – ARMY 20070335

*Discussion*

In the present case, there is both a noncommittal statement by defense counsel, "I guess I waive [the affirmative defenses] I don't know about," as well as a later express waiver of the accident and mistake instructions. These exchanges between the military judge and defense counsel, in the context of the record, leave us with the firm conclusion that defense counsel's statements constitute a purposeful decision to forego instruction on the affirmative defenses of accident and mistake.

A military judge is required to instruct the members on affirmative defenses in issue. *United States v. Lewis,* 65 M.J. 85, 87 (C.A.A.F. 2007) (quoting and citing R.C.M. 920(e)). "A matter is considered 'in issue' when 'some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose.'" *Id.* (quoting R.C.M. 920(e), Discussion; *United States v. Gillenwater,* 43 M.J. 10, 13 (C.A.A.F. 1995)). In this case, the defenses of mistake and accident were in issue, as the defense presented evidence suggesting accidental or mistaken possession.

Civilian defense counsel may have tactically waived the instructions for any of several reasons. Specifically, the voluminous number of images and number of different storage media involved, the time span of possession reflected in the specifications, and potential issues of the legality of appellant's conduct in some instances,[1] make it entirely plausible to conclude defense counsel knowingly abandoned the instruction. Moreover, on appeal, appellant has not alleged ineffective assistance of counsel in waiving an accident or mistake instruction. The record does not support a conclusion that defense counsel's clear "Yes, Sir" response to the military judge's very specific question regarding affirmative waiver of the instruction amounted to anything less than a knowing and purposeful waiver.

We hold defense counsel affirmatively waived the instruction. Waived issues are not subject to appellate review because "a valid waiver leaves no error to correct on appeal." *United States v. Campos*, 67 M.J. 330, 333 (C.A.A.F. 2009) (quoting *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005)).

---

[1] During his testimony on the merits, appellant admitted he downloaded adult pornography to his computer while deployed to Iraq. This prompted a question by a member whether appellant was aware this may have violated applicable general orders related to possession of pornography. The military judge properly disallowed the question and appropriately instructed the members not to consider that issue. Such matters may have been relevant, however, had the defense pursued the accident instruction. *See* R.C.M. 916(f) and *See* Dep't of Army Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 5-4 (1 Jan. 2010) [hereinafter Military Judges' Benchbook], reflecting the legal requirement that, for accident to apply, appellant must have been performing "a lawful act in a lawful manner."

5

Even were we to ignore what we find to be a purposeful and knowing waiver, the military judge made the absence of accident or mistake an elemental requirement of the offense. Specifically, the military judge defined "possession" as requiring "knowing" possession "not the result of accident or mistake." By doing so, the military judge required the members to find beyond a reasonable doubt appellant's possession of more than one thousand child pornography images and videos was not the result of accident or mistake. Thus, the given instruction was arguably more favorable to appellant. *See* R.C.M. 916(f) & (j). These facts negate any material prejudice to appellant regarding omission of the mistake or accident instructions. If any error in failing to give the mistake of fact or accident instructions existed, we conclude it was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *United States v. DiPaola*, 67 M.J. 98, 102 (C.A.A.F. 2008) (citing *Neder v. United States*, 527 U.S. 1, 18 (1999)).

## RETENTION EVIDENCE

### *Opinion Evidence Elicited in Rebuttal During Sentencing*

Appellant was a HALO[2] qualified SF medic who had participated in at least four deployments and had been awarded the Bronze Star Medal for Valor. At the time of his court-martial, appellant had nearly eighteen years of service. Appellant was tried and sentenced by an officer and enlisted panel composed of a colonel, two lieutenant colonels, a major, and two sergeants major.

As part of its sentencing case, the government admitted, without objection, two general officer memoranda of reprimand (GOMOR) issued to appellant for driving under the influence of alcohol (DUI) in 1999 and 2004. Additionally, the government admitted a stipulation of fact between the parties reflecting appellant's civilian conviction in 2004 for third degree criminal trespass.

During the presentencing phase of his trial, appellant's military defense counsel admitted, without objection, a stipulation of expected testimony of Sergeant First Class (SFC) Promotable Dishman. The stipulation outlined SFC Dishman's six-year relationship with appellant, including living with appellant and serving with him during two deployments to Iraq. The stipulation stated in part,

> I definitely think there is a place for [appellant] in the
> Army and within the 10th Special Forces Group. I truly

---

[2] "HALO" stands for High-Altitude Low-Opening, and refers to SF parachute jumps made from extreme altitudes with the chute opening very close to the ground. The altitudes involved require jumpers to use oxygen to breathe, and the descent velocity is so great, jumpers evade radar detection. *See U.S. Army Special Forces* at http://www.goarmy.com/special_forces/equipment.jsp (last visited on 1 Apr. 2010).

> believe that Special Forces is the only place for SFC
> Eslinger.  I would be proud to serve with him in the future
> despite this conviction. . . .  [I] would welcome him to my
> team any day.

Among other witnesses, military defense counsel called two members of appellant's unit to testify in mitigation.  The first, Master Sergeant (MSG) Gibbons, testified on direct examination that he served with and supervised appellant as a medic in Iraq in 2002-2003 and again at Fort Carson from 2006 until the trial.  When asked whether he would be willing to deploy with appellant again, the witness stated:  "I've already packed his bags. . . .  I would take him on my team in a minute."  On redirect, defense counsel asked why appellant deserved another chance.  Citing appellant's past performance, subtantial training, experience as an SF soldier, and rehabilitative potential, the witness stated, "I would say, yes, we need to keep this soldier. . . .  I think, you know, something needs to be done, you know.  Past that, I think he needs to stay in the service."  The trial counsel  asked the military judge to direct the panel to disregard testimony about "keeping the soldier in the Army."  The military judge overruled the objection.

Defense counsel also called Captain (CPT) Coffman, a battalion physican's assistant who supervised appellant for eight months prior to trial.  Captain Coffman characterized appellant as "without peer" and the "best medic" among the forty-three medics he supervised in the battalion.  After discussing how the stress of multiple deployments impacts judgment and behavior, the witness indicated the Army had the resources, ability, and training to help appellant.  Noting he was deploying the next day, CPT Coffman agreed he "would like to have Sergeant First Class Eslinger on the plane" with him when he deployed.

At the conclusion of the defense sentencing case, appellant made a brief unsworn statement, during which he stated:

> And finally, I ask you to allow me to deploy to Iraq to join
> my teammates who are waiting for me in Iraq.  My kit and
> personal gear has been transported to Iraq already based
> on my promise to them that I would be there and the lack
> of doubt in their minds that I would join them in
> continuing the fight on terrorism.

In rebuttal, the government called five witnesses. The first was Major (MAJ) Peltier, the executive officer and acting commander for appellant's battalion.  Major Peltier began describing his background in SF and the composition and characteristics of SF units, noting team members must have "integrity" and "trustworthiness."  Without providing a foundation explaining how the witness knew appellant or his background, the trial counsel asked, "Do you believe Sergeant First

Class Eslinger possesses this integrity?" Major Peltier answered, "Based on what I know about him and his past history and the current proceedings, I would say no." Trial counsel thereafter sought to elicit from the witness the hearsay opinion of appellant's battalion commander, Lieutenant Colonel (LTC) Stoltz. The military judge sustained the objection, and the trial counsel immediately followed up with the following series of questions:

> Q: Major Peltier, what is your opinion regarding the soldier's abilty to deploy or stay in 10th Special Forces Group?
>
> A: It is my opinion that, clearly he should not deploy to combat with this organization. I know that based upon the pattern of misconduct that this soldier has demonstrated, not just recently, but in the past, that he has clearly demonstrated that he lacks integrity, lacks discipline, and he should not deploy with this unit to combat. And for that matter, he should not return to this—the 3rd Battalion. And I'll go a step further in my opinion, based on his pattern of misconduct, *he shouldn't even be in the Army*.
>
> Q. And what was this opinion based upon again?

(emphasis added). After the trial judge sustained another hearsay objection to a repeated attempt by MAJ Peltier to describe the battalion commander's opinion regarding appellant, the trial counsel continued:

> Q. Go ahead, Major Peltier.
>
> A: Okay. I know that of this soldier that he has a pattern of misconduct. . . . A flag officer has, you know—punished him by giving him a memorandum of reprimand for misconduct in the past, not once but twice. I also know that in the civilian sector, he was—had some trouble with trespassing. . . . And based on that, *I cannot see how you can possibly allow him to continue in the service*, not just in the Army but in the Special Forces Group that is deploying to combat for its fifth time.

(emphasis added). All of this testimony occurred on direct examination without objection from defense counsel. Defense counsel did, in cross-examination, establish that MAJ Peltier had no prior contacts with or knowledge of appellant and had only learned of his disciplinary history during the trial.

At the conclusion of MAJ Peltier's testimony, the military judge appropriately gave a limiting instruction to the members that they were not to consider questions regarding the battalion commander's opinion.

The members posed a series of questions to MAJ Peltier. In response, MAJ Peltier opined appellant had no potential as a soldier, and he had no rehabilitation potential for further service to SF or the Army. After this, the trial counsel, as the proponent of the witness, asked MAJ Peltier to explain, without objection, why appellant had no potential as a soldier and no rehabilitative potential.

The government next called Sergeant Major (SGM) Krider, the acting battalion sergeant major, whose foundation for testifying was he knew appellant "vaguely—in a distant manner." Trial counsel asked:

> Q: What is your opinion on whether Sergeant First Class Eslinger should continue to serve in the—Special Forces Group or in the Army?
>
> A: There is *no place in our ranks for Sergeant Eslinger*.
>
> Q: And why do you have that opinion?
>
> A: He has been convicted of three counts of child pornography. He has a record of DUIs. He also has a conviction in the civilian courts for criminal trespass.

(emphasis added).

During cross-examination, defense counsel firmly established that SGM Krider had no prior contact with or knowledge of appellant, and based his opinion principally on appellant's conviction for possession of child pornography. The military judge sua sponte intervened, asking, "Defense . . . any issues with the sergeant major's testimony?" Ultimately, the military judge ruled that, while the limitations of R.C.M. 1001(b)(5) may not technically apply to government rebuttal evidence, "[t]o allow a witness to come in here and say, based only on the offense or primarily on the offense of which the accused has been convicted, that their opinion is there's no place for him in the Army goes too far in my view beyond rebutting what the defense clearly opened the door to." Based on that, the military judge instructed the members, "Members, the opinion expressed by Sergeant Major Krider that the accused does not have potential for further service to the United States Army or within Special Forces was improperly based, and I'm going to direct you not to consider his testimony in that regard."

Next, the government called MSG Stensgaard, a witness who had testified on the merits. Unlike the other rebuttal witnesses, MSG Stensgaard was able to lay a foundation, as he had significant interaction with appellant, having been appellant's team sergeant for two years, training, deploying with, and rating appellant. After establishing through leading questions that MSG Stensgaard was familiar with appellant's prior DUIs and civilian conviction, trial counsel asked:

> Q: Do you have an opinion regarding whether Sergeant First Class Eslinger should remain in 10th Group—10th Special Forces Group or the Army?
>
> A: As a leader in the United States Army, *I don't feel that based on his prior incidences and this conviction how he could remain in the U.S. Army and effectively serve*.

(emphasis added).

The government called as its fourth rebuttal witness, the group (i.e., brigade equivalent) commander, Colonel (COL) Tovo. With the very cursory foundation that COL Tovo knew appellant because he was under his command, and a series of leading questions outlining COL Tovo's knowledge of appellant's GOMORs for DUI and the civilian conviction, trial counsel asked COL Tovo, without objection, the following series of questions:

> Q: . . . Sir, do you want the accused back in your unit?
>
> A: I do not.
>
> Q: Do you want to deploy with the accused?
>
> A. I do not.
>
> Q: *Do you want the accused in the Army?*
>
> A. *No.*
>
> Q: And then, sir, in forming the basis of your opinions, can you please tell the panel what these opinions are based on?

(emphasis added). In cross-examination, defense established that, to the best of COL Tovo's knowledge, appellant had a reputation as an exceptional soldier.

The government's fifth rebuttal witness was Command Sergeant Major (CSM) Sekelsky, the group command sergeant major.  Because the defense objected it had not previously had an opportunity to interview this witness, the military judge asked for an offer of proof as to the witness's testimony, to which trial counsel responded, "Your honor, Command Sergeant Major Sekelsky knows the accused.  He was . . . the battalion command sergeant major for the accused and will testify that he does not want the accused back in 10th Group.  He doesn't want him—."  The defense objected on grounds of cumulativeness in the following exchange:

> DC:  Sir, the defense would object to this witness as cumulative.  They just put the group commander on the stand who's given the consensus of the chain of command.
>
> MJ:  Well, certainly, you would be within your rights to argue that the group commander doesn't really know the accused as well as other people might, with possible exception of Master Sergeant Stensgaard, which is why I asked the government for an offer of proof—
>
> DC:  Yes, sir.
>
> MJ:  —as to how well he knows the accused.
>
> DC:  Okay, sir.
>
> MJ:  This witness appears to have some closer connection with the accused, so I'll overrule your objection.

Command Sergeant Major Sekelsky testified that he had been appellant's battalion command sergeant major for two years, deployed with him to Iraq, would see him occasionally at the forward operating base (FOB),  and had visited appellant's team "twice, I believe."  He had occasional conversations with appellant, "Not in depth.  Just say, 'Hi.  How're you doing.'"

After establishing through leading questions that CSM Sekelsky had knowledge of appellant's reprimands and civilian criminal conviction, trial counsel asked the following questions of the witness:

> Q.  . . . First off, do you, Sergeant Major, want the accused in 10th Special Forces Group?
>
> A.  No
>
> Q:  Do you want to deploy with him to Iraq?

A. No.

Q. *Do you want him in the U.S. Army?*

A. *No.*

Q. And why do you say that, Sergeant Major?

(emphasis added).

### *Discussion*

Here, we examine the scope of government sentencing evidence offered in rebuttal to so-called "retention" evidence. When, as in this case, the defense fails to object to admission of specific evidence, the issue is forfeited, absent plain error. *United States v. Maynard,* 66 M.J. 242, 244 (C.A.A.F. 2008) (citing *United States v. Hardison,* 64 M.J. 279, 281 (C.A.A.F. 2007); *United States v. Powell,* 49 M.J. 460, 463-65 (C.A.A.F. 1998); R.C.M. 905(e)). The plain error standard requires: "(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *Hardison,* 64 M.J. at 281 (citations omitted). Appellant bears the burden of demonstrating the three prongs of the test are met. *Id.* Therefore, while one of the elements of the plain error test is obvious error, admission of the evidence does not warrant relief unless it materially prejudices appellant's substantial rights. *Powell*, 49 M.J. at 464 (citing UCMJ art. 59(a)).

When defense lodges an objection to the admission of evidence, we first consider whether the judge abused his discretion by admitting the evidence.[3] *United States v. Clayton,* 67 M.J. 283, 286 (C.A.A.F. 2009). If so, the government bears the burden to convince the appellate court that admission of the evidence was harmless. *See, e.g., United States v. Pablo*, 53 M.J. 356, 359 (C.A.A.F. 2000) (citing *United States v. Pollard*, 38 M.J. 41, 52 (C.M.A. 1993)). We evaluate prejudice from an erroneous admission or exclusion of evidence during sentencing by assessing whether the error substantially influenced the adjudged sentence. *United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005) (citations omitted). If it substantially influenced the adjudged sentence, then the result is material prejudice to appellant's substantial rights. *Id.* (citing UCMJ art. 59(a)).

---

[3] During the government's rebuttal case, defense counsel's only objection was for cumulative testimony; thus, we apply the abuse of discretion standard to that evidence. We review the admission of all other rebuttal evidence for plain error.

Error

First, with regard to admission of the testimony of several government rebuttal witnesses, we find the military judge committed error by permitting government rebuttal testimony essentially calling for the panel to discharge appellant without imposing a meaningful foundation requirement or providing a necessary limiting instruction.

Rule for Courts-Martial 1001(b) broadly authorizes the government to introduce two types of evidence in sentencing: matters directly related to or arising from the offense and matters related to the accused's character (service, performance, rehabilitative potential). Beginning with *United States v. Horner*, 22 M.J. 294 (C.M.A. 1986), our superior court has interposed what have become well-established parameters governing the scope of government evidence of an accused's character offered in sentencing, particularly related to "rehabilitative potential." These parameters are reflected in several amendments to R.C.M. 1001(b)(5) over the years.[4]

In order to testify regarding an accused's character for rehabilitation, a government witness must first demonstrate an adequate foundation in personal knowledge of the accused and his character. "Simply stated, the opinion envisioned by R.C.M. 1001(b)(5) can only be expressed by a witness who has a rational basis for his conclusions, founded upon the accused's service, performance and character." *United States v. Ohrt*, 28 M.J. 301, 304 (C.M.A. 1989). *See also United States v. Armon*, 51 M.J. 83, 86-87 (C.A.A.F. 1999). Logically, that opinion cannot be based principally upon the offense. *Horner* 22 M.J. at 296 (Testimony was "plainly based not upon any assessment of appellant's character and potential, but upon the commander's view of the severity of the offense. Such testimony is simply not helpful to the sentencing authority."). *See also Ohrt,* 28 M.J. at 307 (testimony lacked a proper foundation to demonstrate opinion was personalized and based upon the accused's character and potential).

---

[4] In 1984, R.C.M. 1001(b)(5) simply provided, "The trial counsel may present, by testimony or oral deposition in accordance with R.C.M. 702(g)(1), evidence, in the form of opinions concerning the accused's previous performance as a servicemember and potential for rehabilitation. On cross-examination, inquiry is allowable into relevant and specific instances of conduct." The current rule's subparts (B) through (F), which impose strict foundation and scope, narrowly define "rehabilitation," and limit reference to specific instances of conduct on direct, are the result of abuses of such evidence identified by case law.

While a witness may make an assessment as to rehabilitative potential, a witness may not comment on or infer a recommendation of a particular sentence, especially a punitive discharge. "It would be ironic and absurd if R.C.M. 1001(b)(5) were construed to allow the parties to call witnesses simply for the purposes of telling the court-martial what offenses, in the witnesses' estimation, require punitive discharges or lengthy confinement, etc." *Horner* 22 M.J. at 296. As the *Ohrt* court noted:

> The question of appropriateness of punishment is one which must be decided by the court-martial; it cannot be usurped by a witness. Thus for the same reasons we do not permit an opinion of guilt or innocence, or of "truthfulness" or "untruthfulness" of witnesses, we do not allow opinions as to appropriate sentences.

*Ohrt*, 28 M.J. at 305.

The prohibition against a witness suggesting a particular sentence includes the so-called "euphemism" rule, which prevents government witnesses from testifying on direct examination that an accused has "no place in the Army" or that an accused should not be returned to the unit. *Ohrt,* 28 M.J. at 305 ("The use of euphemisms, such as 'No potential for continued service;' 'He should be separated;' or the like are just other ways of saying, 'Give the accused a punitive discharge.'"); *United States v. Aurich*, 31 M.J. 95 (C.M.A. 1990); *United States v. Cherry*, 31 M.J. 1 (C.M.A. 1990). In fact, R.C.M. 1001(b)(5) now provides a very precise definition of the term "rehabilitation potential," as the "accused's potential to be restored, through vocational, correctional, or therapeutic training or other corrective measures to a useful and constructive place *in society,*" to deter interpretation of such testimony as a recommendation regarding discharge. (emphasis added).

These clear limits on government evidence of an accused's rehabilitative potential have been clouded by the defense's ability to present "retention" evidence and the government's concomitant ability to rebut such evidence. In *Griggs,* our superior court concluded defense evidence that a witness would continue to serve with the accused is "classic mitigation evidence, which has long been relevant in courts-martial." 61 M.J. at 407 (quoting *Aurich,* 31 M.J. at 97). The court noted R.C.M. 1001(b)(5)(D) expressly precludes a government sentencing witness from offering "an opinion regarding the appropriateness of a punitive discharge or whether the accused should be returned to the accused's unit." *Griggs,* 61 M.J. at 407. However, the court held that rule does not preclude defense witnesses from presenting "retention evidence" in mitigation in the form of testimony the accused should be returned to duty. *Id.* at 409. Therefore, testimony "that a witness would willingly serve with the accused again" is permissible defense mitigation. *Id.* Noting the policy behind R.C.M. 1001(b)(5) was to prevent commanders or their

14

representatives from offering opinions which were not rationally based (i.e., lacked foundation) and implicated undue command influence, the court concluded defense evidence warranted no similar concerns. *Id.*

The court found evidence a servicemember can "continue to be an asset" or that he can still be of "great potential" to his service is a valuable mitigation matter. *Id.* at 410. In essence, defense "retention" evidence amounts to defense evidence of an accused's character for rehabilitation. *Griggs* did *not* hold that defense witnesses may offer an opinion that an accused should not be punitively discharged.[5] Additionally, when retention evidence is at issue, the court found "[A]ny concerns raised can be addressed with a tailored instruction focusing on the distinction between a punitive discharge, which is for the members to decide, and the willingness of a servicemember to serve with an accused again, which may mitigate the range of punishments available at courts-martial."[6] *Id.* at 409-10.

The court in *Griggs* noted if the defense offers permissible opinion evidence on "retention," the government is free to offer rebuttal demonstrating such opinion "is not a consensus view of the command." *Griggs,* 61 M.J. at 410 (quoting *Aurich*, 31 M.J. at 96-7). Witnesses, including the accused, may "open the door" for the prosecution to present evidence that would be inadmissible absent defense sentencing evidence. *See e.g.*, *United States v. Flynn*, 28 M.J. 218, 221-22 (C.M.A. 1989). However, rebuttal evidence must answer the defense case or it is inadmissible. *See, e.g.*, *United States v. Armstrong,* 12 M.J. 766, 767 (A.C.M.R. 1981). Also, the government may not seek to rebut opinions an accused expresses in sentencing statements. *United States v. Cleveland,* 29 M.J. 361 (C.M.A. 1990) (statement that "I feel that I have served well" is not a statement of fact subject to rebuttal). "The prosecution may, however, rebut *any* statements of facts therein." R.C.M. 1001(c)(2)(C) (emphasis added). *See also United States v. Manns,* 54 M.J. 164, 166 (C.A.A.F. 2000) (unsworn statement that he "tried to obey the law" was an assertion of fact that could be rebutted by the prosecution).

The *Griggs* court emphasized two important criteria that help define the permissible scope of testimony when rebutting retention evidence. First, the rebuttal evidence should be "[c]onsistent with the historical concerns regarding command influence." 61 M.J. at 410. Second, it, like defense evidence, should be predicated on a proper foundation. *Id. See United States v. Hursey*, 55 M.J. 34, 36 (C.A.A.F.

---

[5] Specifically, the *Griggs* opinion states: "But an explicit declaration that an accused should not receive a punitive discharge or that any such discharge should be of a certain severity *is disallowed for the defense* not because of R.C.M. 1001(b)(5)(D), but because such evidence invades the province of the members to decide alone on punishment." 61 M.J. at 409 (emphasis added).

[6] Here, the military judge did not give such an instruction.

2001) (government rebuttal testimony by government paralegal NCO impermissible because witness lacked sufficient foundation in personal knowledge to testify about accused's conduct).

These two criteria echo the court's holding in *United States v. Pompey*, 33 M.J. 266, 270 (C.M.A. 1991), wherein the court addressed opinions on rehabilitation in rebuttal. "Upon this premise, *Ohrt* and its progeny apply fully to rebuttal, just as they do in the Government's case-in-chief." *Id.* at 270. "Where a rehabilitation opinion lacks a proper 'rational basis' or presents a risk of command influence, the opinion is no less objectionable because it is offered at the rebuttal stage rather than at the aggravation stage of the sentencing proceeding." *Id.*

Based on the historical concerns with government sentencing evidence and the specific holding of *Griggs*, it remains proper for a military judge to disallow a question of or an answer by a witness regarding whether an accused should be punitively discharged. [7] A military judge may also limit or disallow evidence, which in context unduly suggests a recommendation on discharge. This applies equally to prosecution and defense witnesses. *See United States v. Ramos,* 42 M.J. 392, 396 (C.A.A.F. 1995) (finding no error in a military judge's instruction to members to disregard defense sentencing witness statement that "he thinks [accused] can still be a soldier in the Army").

---

[7] "There can be a thin line between an opinion that an accused should be returned to duty and the expression of an opinion regarding the appropriateness of a punitive discharge." *Griggs*, 61 M.J. at 409. In *United States v. Edwards*, 65 M.J. 622, 625 (N.M. Ct. Crim. App. 2007), a defense counsel attempted to ask a gunnery sergeant whether he would still want the accused in his unit, if the accused had rehabilitative potential *in the Marine Corps*, and whether the accused could be an asset *in the Marine Corps*. The military judge sustained a government objection to all three questions as "an opinion or euphemism for whether or not to retain [the accused]." *Id.* The Navy-Marine court held the military judge committed error. *Id.* at 625-36. Principally because it was a judge alone case, the court found the error harmless. *Id.* at 636. We think that, at least as to the last two questions, the military judge was within his discretion to sustain an objection, if in context it suggested the accused not be punitively discharged, or if the opinion were not well-supported by a foundation regarding knowledge of the accused and his character. Were the case before members, we would expect the military judge to give an appropriate limiting instruction emphasizing such evidence constitutes a personal opinion of an accused's character and not a specific recommendation on sentence.

Clearly, in this case, at several points, the defense opened the door to rebuttal regarding "retention evidence."  Appellant's statement that his fellow deploying soldiers' "lack of doubt in their minds that [he] would join them in continuing the fight on terrorism" alone arguably would not have been subject to rebuttal.  *See Cleveland,* 29 M.J. at 363-64.  However, the opinion expressed in the stipulated testimony of SFC Dishman put in issue appellent's continued place in the Army and 10th Special Forces Group.  Likewise, MSG Gibbons's opinion that appellant "needs to stay in the service" provided another basis for rebuttal.[8]  Similarly, CPT Coffman's opinion that he would like appellant to deploy with him to Iraq may have been subject to rebuttal.

However, several parts of the government's rebuttal case conflicted with the constraints laid out in *Griggs*.  First, with regard to MAJ Peltier, SGM Krider, and COL Tovo, the testimony of each of these witnesses was predicated on little to no foundation for an opinion on appellant's character.[9]  In the absence of such a foundation outlining these witnesses' personal knowledge of appellant's background or character,[10] their subsequent testimony both lacks probity and increases the potential for prejudicial misuse of their opinions.  The general rule is that when and whether an adequate foundation has been laid is a matter within the sound discretion of the judge.  Military Rule of Evidence [hereinafter Mil. R. Evid.] 104(a).  When

---

[8] Based on our analysis, we think the military judge could have appropriately provided a limiting instruction to the members when the trial counsel objected to this specific statement.   We also recognize opinion evidence about appellant's continued service "in the Army," to which the trial counsel did not object, had already been put in issue by the stipulation of expected testimony of SFC Dishman.

[9] The military judge acknowledged the scant foundation of these three witnesses in overruling the cumulative objection to the testimony of CSM Sekelsky, the government's fifth rebuttal witness.  The military judge first noted that defense was within their rights to argue the previous government witnesses, with the possible exception of MSG Stensgaard, did not really know the accused, but because "[t]his witness appears to have some closer connection with the accused" CSM Sekelsky's testimony was not cumulative.  We conclude CSM Sekelsky's testimony was, in fact, cumulative.  *See United States v. Ashby*, 68 M.J. 108, 120 (C.A.A.F. 2009).  However, that does not affect our ultimate conclusion regarding prejudicial impact on appellant's sentence.

[10] The foundational requirement for a rebuttal witness to testify, as to a willingness to serve with an accused again, may be less demanding than that required for a rebuttal witness to render an opinion of an accused's rehabilitative potential.  However, military judges must look to the principles of R.C.M. 1001(b)(5) to find a rational basis and other evidentiary rules governing such testimony.

dealing with government sentencing witnesses, particularly commanders in member cases, we strongly suggest foundations be established first in an Article 39a, UCMJ session or by proffer, as recommended by *Ohrt*, 28 M.J. at 307, n.6. A foundation consisting of a recent acquisition of knowledge of an accused's disciplinary history (i.e., in preparation for testimony) should not typically be considered sufficient to permit a meaningful opinion on character.

We commend the military judge for sua sponte instructing the members to disregard SGM Krider's testimony, despite the failure of the defense to object, because of the obvious lack of proper foundation, a point emphasized on cross-examination. We conclude, however, that while not strictly applicable, both the foundation and scope requirements of R.C.M. 1001(b)(5)(B)-(F), reflect proper limits to government rebuttal to defense retention evidence.[11] These rules simply restate the fundamental evidentiary requirements of witness competence reflected in Mil. R. Evid. 601 and 701 (and paralleled in Mil. R. Evid. 405 and 608). Moreover, even in rebuttal, government witnesses may not recommend or appear to recommend a punitive discharge. *Pompey,* 33 M.J. at 270; *Griggs*, 61 M.J. at 409.

Second, we are concerned with the potential for implication of command influence, which underlies *Ohrt* and its progeny. When the government offers testimony of a senior officer or commander in sentencing without first laying an appropriate foundation, it suggests the government is using the witness's status to improperly influence the panel's decision on sentence. Here the testimony of MAJ Peltier, the acting battalion commander, was wholly devoid of foundation. Instead, during his testimony, he repeatedly invoked the name—and sought to quote the opinion of—the battalion commander regarding whether appellant should deploy and remain in the SF Group and the Army. In addition to improperly reciting specific facts of appellant's prior disciplinary actions on direct examination, MAJ Peltier noted those actions (reprimands) reflected the judgments of "a flag officer" regarding appellant's character. This effort to invoke the opinion of other and more senior officers cannot substitute for the witness's lack of articulated basis to rebut

---

[11] R.C.M. 1001(b)(5) regulates government rehabilitative potential evidence in its case-in-chief, and was developed in response to concerns that such evidence may be improperly based or construed as a recommendation to punitively discharge an accused. Defense evidence reflecting willingness to serve or deploy with or retain appellant is essentially rehabilitative potential evidence under R.C.M. 1001(c). When the defense "opens the door" with such evidence, the government is free to rebut whatever specific opinion is offered under R.C.M. 1001(d), not limited to strict definitions of "rehabilitative potential" under R.C.M 1001(b)(5)(A). However, the underlying framework of 1001(b)(5), particularly regarding foundation and basis for the opinion and the scope of the testimony, as well as the prohibition on recommendation of a punitive discharge, offer a logical and legally appropriate basis to regulate government rebuttal to "retention" evidence.

the defense witnesses. Likewise, the foundation for COL Tovo's and SGM Krider's testimony was based on their positions within appellant's brigade and battalion command structure. We recognize the language of *Griggs* regarding rebuttal ("if the accused opens the door . . . the Government is permitted to prove that is not a consensus view of the command") may appear to suggest the government should call commanders or command representatives to rebut so called "retention evidence." 61 M.J. at 410 (quotation and citation omitted). The focus, however, should be on the ability of the witness to lay a proper foundation, rather than his rank or position.[12]

Third, we are concerned with the repeated, impermissible practice of requesting these and all government rebuttal witnesses on direct examination to explain the basis for their opinions. *United States v. Rhoads*, 32 M.J. 114, 115 (C.M.A. 1991). Inquiry into specific instances of conduct which support or undermine the opinion are limited to cross or redirect examination.[13] Mil. R. Evid.

---

[12] We do not intend to suggest that trial counsel may not call commanders in rebuttal. However, using senior level commanders as government sentencing witnesses is often problematic. *See United States v. Sanford*, 29 M.J. 413, 415 (C.M.A. 1990) (using a battalion commander to testify about impact of drug abuse is improper. "Though less blatant than other forms of command influence . . . the practical effect of edifying a court-martial with a commander's general views can be the same."). *See also United States v. Gordon*, 31 M.J. 30 (C.M.A. 1990) (using a brigade commander to testify about impact of negligent homicide on unit is improper sentencing evidence). Such witnesses generally lack the essential contact with and personal knowledge of the accused and his character to provide appropriate testimony. *United States v. Armon*, 51 M.J. 83 (C.A.A.F. 1999) (colonel testifying about character of staff sergeant impermissibly lacked necessary foundation). The testimony of senior noncommissioned officers who lack an adequate foundation may also raise concerns of unlawful influence. *Id.; United States v. Coraine*, 31 M.J. 102, 106 (C.M.A. 1990). *See United States v. Malone*, 38 M.J. 707, 709-10 (A.C.M.R . 1993) (noting the *Cherry/Ohrt* rules were designed specifically to address the court's concern about the impact of commander opinion testimony). "[C]ommanders should rarely testify adversely about an accused based solely on that 'commander's opinion' of the accused and his crime." *Aurich*, 31 M.J. at 97. The court characterized such testimony as "merely the flip side of suppressing favorable testimony," noting it is "fraught with danger of undue and unlawful influence." *Id.*

[13] This is indeed fundamental. *See* Crim. Law Dep't, The Judge Advocate General's Legal Center and School, U.S. Army, *The Advocacy Trainer*, C-7-10 (2008) a basic

(continued . . .)

405(a). *See also* R.C.M. 1001(b)(5)(E) & (F). For government rehabilitation witnesses, inquiry into relevant and specific instances of conduct is permitted only on cross-examination or redirect. *Id.* On direct examination, a witness may not explain the basis for his opinion. *Rhoads*, 32 M.J. at 116; *United States v. Gregory*, 31 M.J. 236, 238 (C.M.A. 1990). *United States v. Sheridan*, 43 M.J. 682, 684 (A.F. Ct. Crim. App. 1995).

Finally, we are concerned the government rebuttal to the specific defense retention evidence was outside the parameters established by *Griggs*. In this case, five government witnesses called for appellant's discharge in the guise of rebuttal. The witnesses testified appellant "shouldn't even be in the Army," "there is no place in our ranks for Sergeant Eslinger," and appellant cannot "remain in the U.S. Army and effectively serve." These remarks went beyond rebutting a defense witness's expressed willingness to continue serving with appellant, and in fact, called for the panel to discharge appellant. While the defense may have "opened the door" with the stipulated testimony of SFC Dishman, the military judge should have limited the testimony or placed it in permissible context with a limiting instruction. Here, with the exception of SGM Krider's testimony, the military judge gave no limiting instruction regarding the testimony of the government's rebuttal witnesses. An appropriate instruction must distinguish testimony of the willingness of a servicemember to serve with an accused again, which may mitigate the range of punishments, from testimony calling for a punitive discharge, which is for the members to decide.

Error was Clear and Obvious

Based on the foregoing analysis, we find clear and obvious error in the admission of evidence which both lacked foundation and raised command influence concerns, without proper limiting instruction. The evidence conflicted with the guidance set forth in *Griggs* related to permissible government rebuttal to so-called retention evidence. *Griggs*, 61 M.J. at 410.

In sum, we conclude defense "retention" evidence constitutes a form of rehabilitative potential evidence, which requires a proper foundation and may not be construed as a recommendation on a specific sentence. As such, the historic concerns of government misuse or misinterpretation of such evidence, reflected in R.C.M. 1001(b)(5)(B)through (D) apply, even in rebuttal. The *Ohrt* court noted in 1989, "[F]or those reasons we do not permit an opinion of guilt or innocence, or of 'truthfulness' or 'untruthfulness' of witnesses, we do not allow opinions as to appropriate sentences." 28 M.J. at 305. In 2005, *Griggs* increased the range of

---

(. . . continued)
advocacy training manual that highlights the impropriety of asking a prosecution sentencing witness to explain an opinion regarding an accused's rehabilitative potential on direct examination.

retention evidence that could be offered. 61 M.J. 402. However, *Griggs* sets out three essential requirements for so-called retention evidence, whether from the defense or in government rebuttal. First, such testimony must be predicated on an appropriate foundation. *Id.* at 407. Second, it cannot directly or by inference comment on the appropriateness of a punitive discharge. *Id.* Finally when such evidence is introduced before members, the military judge should give instructions emphasizing "the distinction between a punitive discharge, which is for the members to decide, and the willingness of a servicemember to serve with an accused again." *Id.* at 409. Because of the case law's extensive history in this area, we hold the error was clear and obvious.

Prejudice

An erroneous admission or exclusion of evidence during the sentencing portion of a court-martial is tested to determine if the error substantially influenced the adjudged sentence. *Griggs*, 61 M.J. at 410 (citations omitted). If the error substantially influenced the adjudged sentence, then the result is material prejudice to appellant's substantial rights. UCMJ art. 59(a). We typically test for prejudice using the factors set out in *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999). However, for sentencing errors, we find the analysis set out in *Saferite* more useful. *United States v. Saferite*, 59 M.J. 270, 274-75 (C.A.A.F. 2004). Per that analysis, we consider: 1) the probative value and weight of the evidence; 2) the importance of the evidence in light of other sentencing considerations; 3) the danger of unfair prejudice resulting from the evidentiary ruling; and 4) the sentence actually imposed, compared to the maximum and to the sentence the trial counsel argued for. *Griggs* 61 M.J. at 413 (Crawford, J. dissenting) (citing *Saferite*, 59 M.J. at 274-75).

We find the third factor favors a finding of prejudice, as appellant was tried by members, and no limiting instruction was given when the evidence was erroneously admitted. Members are less likely to separate relevant matters and make their decisions based solely on admissible evidence. *United States v. Wingart*, 27 M.J 128, 136 (C.M.A. 1988) (holding that relaxing the rules of admissibility at sentencing hearings would generate difficulties "especially . . . when sentencing is by court members instead of by the judge"). The "experienced and professional military lawyers who find themselves appointed as trial judges are assumed to be able to appropriately consider only relevant material in assessing sentencing, the same cannot be said for members." *United States v. Hardison,* 64 M.J. 279, 284 (citations and quotations omitted). *See also United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006) (holding that "particularly in light of the fact that the sentencing was by a military judge sitting alone," appellant failed to show how impermissible evidence had prejudiced him). In finding no prejudicial error, the court in *Aurich* similarly based its finding on the fact the trial was before a judge alone. *Aurich*, 31 M.J. at 97. *See also United States v. Hill,* 62 M.J. 271 (C.A.A.F. 2006); *United States v. Fisher*, 67 M.J. 617 (Army Ct. Crim. App. 2009) (court

found judge alone forum significantly attenuated any prejudice in admission of potentially improper sentencing evidence); *United States v. Bridges*, 66 M.J. 246 (C.G. Ct. Crim. App. 2008). Forum impacts the potential for prejudice, and when a case is tried before members, appropriate guiding instructions may significantly influence the prejudice analysis. *See Griggs,* 61 M.J. at 409-10; *Cherry*, 31 M.J. at 6; *Hardison*, 64 M.J. at 284. No instruction was given in this members case.

We find the remaining three factors, however, favor a finding of no prejudice. Here, the probative value and weight of the evidence was limited, given appellant's offenses. In this case the only offending testimony went to the issue of potential discharge. We are convinced that no amount of mitigating and extenuating evidence would have foreclosed the imposition of a punitive discharge for a soldier possessing more than 1,700 images of child pornography, willfully collected, over several years, at several locations. For these same reasons, we conclude the importance of the erroneously admitted evidence in light of other sentencing considerations is slight.

Ultimately, our conclusion must be based on whether the error substantially impacted appellant's sentence, particularly with regard to a punitive discharge. Here, while appellant had an excellent reputation for performance and had valorous service in multiple deployments in over seventeen years of service, he also had a significant history of disciplinary actions and civilian criminal misconduct. Finally, the evidence also showed over the course of several years, he had possessed more than 1,700 images and videos of child pornography.

Appellant faced a maximum punishment that included thirty years confinement and a dishonorable discharge. The trial counsel argued for a sentence of five years confinement and a dishonorable discharge. The members sentenced appellant to reduction to Private E1, total forfeitures, confinement for three years, and a bad-conduct discharge. While we conclude the errors in this case had the potential to prejudice appellant's sentence, the panel's sentence to one-tenth of the maximum confinement and a lesser punitive discharge compellingly demonstrates the erroneously admitted evidence did not substantially influence any part of appellant's sentence. For the same reasons, we arrive at a similar conclusion with regard to the testimony of SGM Sekelsky, admitted over objection, on grounds of cumulative evidence.

Though we do not find prejudice in this case, we hold the foundation and scope of testimony by government witnesses rebutting so-called defense retention evidence must generally conform with the principles of R.C.M. 1001(b)(5)(B)-(D). Moreover, we urge military judges in cases tried before members to provide appropriate limiting instructions whenever such evidence is introduced. As an appendix to this opinion we provide a suggested instruction, some version of which might be useful if included in the Military Judges' Benchbook.

ESLINGER – ARMY 20070335

## CONCLUSION

On consideration of the entire record, we hold the findings of guilty and the sentence as approved by the convening authority correct in law and fact. Accordingly, those findings of guilty and the sentence are AFFIRMED.

Chief Judge TOZZI, Senior Judge JOHNSON, Judge HOFFMAN, Judge COOK, Judge HAM, Judge SIMS, Judge BAIME and Judge GIFFORD concur.

CARLTON, Judge, concurring in the result:

I concur. I however write separately to highlight my concern that the majority opinion could be interpreted as limiting government rebuttal in sentencing to the confines of Rule for Courts-Martial [hereinafter R.C.M.] 1001(b). I find the majority's use of R.C.M. 1001(b) to address error occurring during government rebuttal in this case could prove confusing to the practitioner as to applicability of R.C.M. 1001(b) to rebuttal. The majority uses R.C.M. 1001(b) to illustrate the scope of appropriate rebuttal to rehabilitation testimony in light of the error herein where defense presents retention mitigation evidence allowed by *United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005). *United States v. Eslinger*, ___ M.J. ___ (Army Ct. Crim. App. 14 May 2010). However, R.C.M. 1001(b) applies to the government's sentencing case in aggravation and R.C.M. 1001(d) applies to rebuttal. The majority's use of R.C.M. 1001(b) in the context of discussing rebuttal seems to blur the rules for aggravation and rebuttal and could therefore prove confusing to practitioners.

I agree with the majority that opinion testimony as to the accused's rehabilitative potential must possess a rational basis for the witness's conclusions founded upon the accused's service, performance and character. The requirement for a rational evidentiary foundation of personal knowledge for such opinion testimony is not unique to R.C.M. 1001(b), but rather constitutes a basic foundational requirement for the admission of any such opinion evidence.[1]

---

[1] *See* Military Rule of Evidence [hereinafter M.R.E.] 401 (definition of relevant evidence); M.R.E. 403 (balancing of probative value with potential prejudice); M.R.E. 404 (character evidence not admissible to provide conformity in conduct); M.R.E. 405 (methods of proving character); M.R.E. 602 (personal knowledge of

(continued . . . )

The rules of evidence and jurisprudence applicable to rehabilitative potential opinion evidence offered in rebuttal mirror the evidentiary rules applicable to opinion testimony of rehabilitative potential offered in the government case in aggravation as summarized by R.C.M. 1001(b)5(B)–(F). Military jurisprudence clearly prohibits rebuttal evidence from circumventing the rules of evidence. *See United States v. Lowe*, 56 M.J. 914 (N.M. Ct. Crim App. 2002) (finding government barred from using hearsay evidence in form of specific instances of conduct to impeach an opinion of defense mitigation evidence). *See also United States v. Manns*, 50 M.J. 767 (N.M. Ct. Crim. App. 1999), *aff'd* 54 M.J. 164 (C.A.A.F. 2000). In this case, however, rebuttal evidence faced no defense objection to a lack of evidentiary foundation.

With respect to the government rebuttal in this case, the majority provides that the proper scope of government rebuttal was potentially clouded by the presentation of defense "retention" evidence. *Eslinger*, ___ M.J. at ____. *Griggs* explained that the government may rebut such defense retention evidence by testimony that such opinion fails to constitute a "consensus view of the command." 61 M.J. at 410 (quoting *United States v. Aurich,* 31 M.J. 95, 97 (C.M.A. 1990)). I concur with the majority that the government is prohibited on rebuttal from presenting testimony commenting on the appropriateness of a punitive discharge. I also concur that the government is prohibited from presenting rebuttal testimony lacking in evidentiary foundational requirements, even if the defense presents classic mitigation evidence of retention evidence. Nothing in *Griggs* relieved the government of its obligation to meet evidentiary foundational and relevance requirements for rebuttal evidence. Alternatively, *Griggs* stated that the prohibition of commenting on the appropriateness of a punitive discharge remained the rule for both the defense and government. *Griggs*, 61 M.J. at 409. The *Griggs* court further explained that this prohibition was not based upon R.C.M. 1001(b). *Id. See also United States v. Ohrt*, 28 M.J. 301 (C.M.A. 1989) (prohibiting direct testimony and inferences regarding the appropriateness of a punitive discharge). In sum, I respectfully submit that the impact of *Griggs* provided no change to the rules for rebuttal for the government, but instead clarified only that the door opened during the defense case in mitigation for the defense to present classic mitigation evidence pertaining to retention asserting that fellow soldiers would willingly serve with the accused again. *Griggs*, 61 M.J. at 410.

---

(. . . continued)

matter required as basis for testimony to a matter); M.R.E. 701 (opinion testimony by lay witness limited to opinions or inferences that are rationally based upon the perception of the witness and helpful to clear understanding).

Substantial difference exists between evidence which may be initially introduced by the government relative to sentencing and that which it may properly present in rebuttal to the defense evidence.  The government is not limited on rebuttal to offering only evidence that would have been admissible in aggravation, since the government rebuttal serves the purpose of rebutting the matters presented by the defense.[2]  R.C.M. 1001(d).  However, in contrast, R.C.M. 1001(b)(4) limits the scope of aggravation evidence to matters that directly relate to or result from the offense and confusion could result from a practitioner's misplaced application of R.C.M. 1001(b) to rebuttal.  R.C.M. 1001(b).  In this case, however, the defense failed to lodge proper objections where government rebuttal testimony exceeded its permissible scope by commenting on or inferring the appropriateness of a punitive discharge.

In the case at bar, I agree with the majority that the government testimony in rebuttal exceeded the bounds of appropriate rebuttal of defense retention evidence testimony, and I further concur that the opinion testimony of the government rebuttal witnesses lacked a sufficient evidentiary basis.  Like the majority, I find no prejudice to the accused resulted from these errors.  Accordingly, I concur to affirm the findings of guilty and the sentence in this case.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[2] *See United States v. Hallum*, 31 M.J. 254 (C.M.A. 1990) (finding uncharged misconduct proper rebuttal to good soldier evidence, court stated that rebuttal fell within discretion of trial judge and was restricted by evidence made necessary by opponent's case); *United States v. Morris*, 62 M.J. 688 (N.M. Ct. Crim. App. 2006) (no abuse of discretion found in admission of positive urinalysis on sentencing in rebuttal in AWOL case where accused asserted that he went AWOL due to family concerns; urinalysis suggested different motive for AWOL other than the altruistic motive suggested by accused on sentencing).

## APPENDIX

**NOTE:  In a sentencing case before members, when a witness offers evidence which might be construed as comment on the appropriateness of a punitive discharge, the military judge should give the following instruction, tailored to the specific evidence.**

*For evidence offered in extenuation or mitigation*

You have heard the testimony of [a] witness[es] indicating an opinion regarding [a desire to continue to serve with the accused] [a desire to deploy with the accused] [the accused's rehabilitative potential].  The opinion of a fellow service member indicating [a desire to continue to serve with] [a desire to deploy with] [the positive rehabilitative potential of] an accused is a matter pertaining to the accused's character which may mitigate the range of permissible punishments you adjudge.

*For evidence offered in aggravation or rebuttal*

The opinion of a witness [that he or she does not wish to continue to serve with the accused] [that the accused should not [deploy with] [or] [return to] the unit] [that the accused has limited rehabilitative potential] is not an aggravating factor and you cannot use that evidence to increase the severity of the accused's sentence.

*Concluding Instruction*

You may not consider such testimony as a recommendation regarding the appropriateness of a punitive discharge or any other specific sentence in the accused's case.  Whether or not the accused should receive the severe punishment of a punitive discharge or any other punishment is a matter for you alone to decide in the exercise of your independent discretion based on your consideration of all the evidence you have heard.   No witness may suggest a specific element of punishment or sentence.  [This rule does not apply to testimony by the accused regarding personal requests he/she may make in relation to specific punishments.]

In evaluating the ability of a witness to comment on the accused's character, you should consider how well the witness knows the accused, and the nature, quality, and history of contacts the witness has had in determining the value of any opinion the witness may render with regard to the accused.